El Pueblo de Puerto Rico, demandante y apelado, *v.* Felipe López Lugo y Ramón Bonilla Infante, acusados y apelantes.

Núm. 12191–94.—*Sometido:* Junio 27, 1947. *Resuelto:* Julio 16, 1947.

---

[1]*Autoridad de Tierras* v. *Registrador,* 62 D.P.R. 506.

*Jorge L. Córdova, Philip Montalvo, Héctor Reichard* y *Oscar Souf-front,* abogados de los apelantes; *Hon. Procurador General Luis Negrón Fernández,* y *Joaquín Correa Suárez, Fiscal Auxiliar del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

Felipe López Lugo, comerciante mayorista de San Sebastián, y dos de sus empleados, Pedro Olivencia y Ramón Bonilla, apelan de cuatro sentencias de la Corte de Distrito de Aguadilla, condenándoles por alegadas infracciones a la Ley Insular de Suministros y a la Orden Administrativa Núm. 8 expedida de conformidad con dicha ley.

Se imputó a los acusados haber facturado a cuatro detallistas más cantidad de manteca de la que entregaron en cuatro ventas efectuadas, lo que venía a resultar en haberse

pagado por dicha manteca un precio mayor que aquél fijado por el Administrador General de Suministros. Se acusó a López en los cuatro casos. En tres de ellos el coacusado fué Bonilla y en el cuarto, Olivencia.

Los casos se vieron conjuntamente ante la corte de distrito, y los acusados fueron declarados culpables. López fué sentenciado a dos años nueve meses de cárcel y a pagar $14,000 de multa, por los cuatro delitos. Por tres delitos Bonilla fué sentenciado a un año de cárcel y $1,100 de multa. Olivencia fué sentenciado a tres meses de cárcel y a pagar $500 de multa, por un delito.

Las apelaciones en los cuatro casos fueron también vistas conjuntamente. Alegan los acusados que la corte inferior cometió error (1) al estimar probado que en cada uno de los cuatro casos se entregó menos manteca de la facturada; (2) al estimar probado que los tres acusados voluntariamente (*willfully*) figuraron en factura cantidades distintas a las entregadas; (3) al no declarar con lugar las excepciones perentorias; y (4) al imponer a los acusados castigos crueles e inusitados y multas excesivas en violación de la sección 2 del Acta Orgánica.

Al examinar el primer error, encontramos que no hay controversia sobre las circunstancias que rodearon las transacciones. El viernes 9 de agosto de 1946, durante un período de aguda escasez de manteca en Puerto Rico, López llamó por teléfono al Alcalde de San Sebastián, quien también era Presidente de la Junta Local de Suministros. Le dijo que él era la única persona en el pueblo que había recibido manteca; que había una gran aglomeración de gente en su establecimiento; y que temía a las dificultades y trastornos que pudieran surgir si trataba de distribuir la manteca entre toda dicha gente. Le pidió al Alcalde que, como Presidente de la Junta Local, se hiciera cargo de la distribución de la manteca, ofreciéndose a donar la misma con el

fin de que la Junta pudiera distribuirla. El Alcalde se negó tanto a recibir la donación de manteca como a hacerse cargo de la distribución.

Entonces López mandó a buscar un policía para que mantuviera el orden mientras se vendía la manteca. Todas las ventas se hicieron luego en presencia de este policía. Olivencia, empleado de López, tomaba las órdenes, preparaba las facturas y recibía el pago de la manteca, después de lo cual le entregaba las facturas a los compradores. Estos le llevaban entonces las facturas a Bonilla y a tres otros empleados del acusado, quienes entregaban la manteca echándola en latas vacías que los propios compradores traían. Esta división del trabajo entre Olivencia y Bonilla y los otros era la práctica corriente del establecimiento.

Nadie se quejó a López, al policía o a cualquiera otra persona de que se había despachado manteca de menos. Sin embargo, cuatro detallistas, al salir del establecimiento de López, fueron a otros sitios a pesar sus latas de manteca. Según ellos, las romanas de los otros establecimientos demostraban que el peso de su manteca no estaba completo. Nunca explicaron cómo llegaron a esta conclusión ya que repesaron las latas llenas sin determinar y rebajar del peso total el peso de sus latas vacías.

Estos cuatro detallistas fueron a la Alcaldía a quejarse ante el Alcalde. Dejaron allí sus latas de manteca hasta el lunes, 12 de agosto, en un sitio en la Alcaldía por donde discurría libremente mucha gente. Antes de llevar su lata de manteca al municipio, uno de los compradores ya la había dejado en una zapatería durante hora y media mientras hacía unas diligencias.

El 12 de agosto un inspector municipal de pesas y medidas, el Alcalde, un policía y los cuatro adquirentes se reunieron para realizar un experimento. Primeramente pesaron una lata vacía de manteca, que tenía su tapa, y que en lo sucesivo se denominará como la lata X. No hay prueba de

dónde vino esa lata X. Encontraron que la misma pesaba 3¼ lbs. Entonces procedieron sobre la suposición no establecida de que las latas vacías utilizadas por los cuatro detallistas para llevarse la mantéca comprada, pesaban lo mismo que la lata X, es decir 3¼ lbs. Los cuatro compradores rebajaron entonces las 3¼ lbs. del peso total de sus cuatro latas llenas. Mediante este procedimiento llegaron a la conclusión de que la manteca, si bien se le vendió a ellos como pesando 26, 28, 24 y 12 lbs., de hecho pesó, en el caso de los primeros dos, 2 lbs. menos y en el caso de los otros dos, libra y cuarto y ¾ de libra menos que el peso indicado en las facturas. Esto, según ellos, era exactamente la misma diferencia en peso habida para cada lata de manteca, hallada por ellos el viernes anterior en las romanas de tres comerciantes distintos.

Los cuatro compradores y los otros que intervinieron en este experimento asumieron que la lata X y las cuatro latas vacías usadas para llevarse la manteca comprada pesaban lo mismo, no obstante el hecho de que las cuatro latas eran algo distintas entre sí y diferentes de la lata X. La prueba fué contradictoria en cuanto a estas diferencias. Si bien aquellos presentes en el experimento tomaron notas en cuanto a los pesos y nombres de los compradores, no lo hicieron en cuanto a estas diferencias.

Tanto el inspector como el policía declararon que una de las cuatro latas tenía un mango de madera. El inspector dijo que una lata era amarilla y que las otras tres eran color de zinc. Se admitió que la lata X tenía una tapa, pero los testigos del Pueblo difieren en cuanto a si una, dos o tres de las cuatro latas no tenían tapa. Si bien hubo prueba en cuanto a que las cuatro latas y la lata X eran del mismo tamaño y clase, los testigos no sabían si la lata X y una o más de las otras cuatro fueron fabricadas por la misma firma o si eran del mismo espesor.

Uno de los cuatro compradores declaró que cuando recibió su manteca de Bonilla su lata estaba limpia y no tenía man-

teca por fuera. Sin embargo, cuando las cuatro latas fueron pesadas en el experimento llevado a cabo tres días después —luego de haber permanecido durante dichos 3 días en un edificio público al cual la gente tenía libre acceso, en una época en que la manteca estaba escasa en extremo—de acuerdo con el inspector y con el policía, éstas estaban "untadas de manteca," "no se veían limpias," y estaban "pringadas de manteca."

Esta fué la prueba del Pueblo. Por los tres acusados, declaró un comerciante que compró manteca en el establecimiento de López el día 9 de agosto de 1946 y le dieron el peso exacto. Se estipuló que 10 detallistas declararían al mismo efecto. El policía que estaba allí para mantener el orden declaró que nadie se le quejó y que no observó nada ilegal allí.

López, sus dos empleados y el policía declararon en cuanto a los cientos de detallistas que compraron manteca en dicho día, sin que nadie se quejara del peso o del precio. Olivencia corroboró la prueba de El Pueblo al efecto de que él solamente preparaba las facturas y nada tenía que ver con el peso y la entrega de la manteca, lo que era hecho por Bonilla y otros tres empleados. Bonilla declaró que él y otros tres empleados pesaban y entregaban la manteca, que él había entregado a todos los compradores del 9 de agosto el peso completo y que nadie se le había quejado.

Ni de la prueba de El Pueblo ni de la del acusado aparece que López tomó participación en alguna de las cuatro ventas aquí envueltas, excepto que Olivencia declaró que él había notado que hubo un error al calcular el precio de la manteca que se le vendió a un detallista, y que debido a estar muy ocupado le dió la factura a López para que éste la volviera a calcular, lo que éste hizo.

Existe considerable base para la contención de que El Pueblo no estableció fuera de duda razonable que los acu-

sados entregaron a los cuatro comerciantes detallistas menos manteca que lo que indicaban sus facturas. Esta acusación envuelve a un comerciante que quiso hacer un donativo en vez de vender manteca y que no tuvo intervención personal en estas transacciones. Otro de los acusados, Olivencia, nada tuvo que ver con el peso; solamente desempeñó su deber regular y corriente de hacer las facturas y cobrar el importe de las ventas. Bonilla jura que le entregó el peso completo a todos los compradores. Muchos otros que compraron en dicho día corroboran esta declaración. El caso de El Pueblo se basa casi exclusivamente en un experimento dudoso realizado 3 días después de efectuarse la venta, en el que la manteca propiamente dicha, nunca se pesó separadamente y en el que el peso de las latas pertenecientes a los compradores fué considerado como el mismo—3¼ lbs.—de la lata X, sin ninguna demostración satisfactoria al efecto de que las cuatro latas y la lata X en realidad pesaban lo mismo. Las cuatro latas de manteca permanecieron en un sitio público por tres días en una época en que todo el mundo en Puerto Rico trataba desesperadamente de obtener manteca. Y los propios testigos de El Pueblo indicaron que la apariencia de estas latas demostraba que se había bregado con la manteca durante estos tres días. *Cf. Pueblo* v. *García,* 47 D.P.R. 678; *Zimberg* v. *United States,* 142 F.2d 132, 135 (C.C.A. 1, 1944).

Sin embargo, nos sentimos renuentes a intervenir con las conclusiones de hecho de la corte de distrito. En vista del resultado a que llegamos en nuestra discusión del segundo error, asumimos, por tanto, sin decidirlo, que la corte inferior estuvo justificada en resolver que las cuatro latas de manteca pesaban una cantidad indeterminada menor que lo que indicaban las facturas.

En el segundo error los acusados alegan que aun suponiendo que la manteca pesase menos que lo que indicaban

las facturas, no hubo demostración alguna al efecto de que los acusados voluntariamente hicieron las facturas por cantidades distintas a las entregadas.

El estatuto aquí envuelto, Ley núm. 228, Leyes de Puerto Rico, 1942 ((1) pág. 1269), según fué enmendada por la Ley núm. 493, Leyes de Puerto Rico, 1946 ((1) pág. 1475), fué copiado sustancialmente de la Ley Federal de Emergencia sobre Control de Precios de 1942. *Ex parte Irizarry*, 66 D.P.R. 672. Tanto la sección 13 de nuestra Ley como la sección 205 de la Ley Federal, 50 U.S.C.A. App. sección 925, fijan otras sanciones, tales como cancelación de licencias, interdictos y acciones civiles por triple daño, cuando las infracciones a la misma no son voluntarias, véase *Hecht Co.* v. *Bowles,* 321 U.S. 321; solamente en caso de una infracción voluntaria pueden invocarse las sanciones penales de las leyes Federal e insular. *Yakus* v. *United States,* 321 U.S. 414, 435; *United States* v. *Renken,* 55 F. Supp. 1, 3 (Dist. Ct., S.C., 1944); *Compañía Importadora, etc.* v. *Caldwell & Co.,* 58 N.Y.S.2d 745, 750 (1945); *Husers* v. *Papania,* 22 S.2d 755, 757 (La., 1945).

Por tanto se torna importante determinar el alcance del adjetivo "voluntariamente". Esta es una palabra "de muchos significados, influyendo muchas veces su contexto en la interpretación de la misma." *Screws* v. *United States,* 325 U.S. 91, 101. Sin embargo, el problema no es muy difícil aquí ya que la ley Federal de la cual se ha copiado la nuestra ha sido interpretada judicialmente. El uso de la palabra "voluntariamente" en la disposición penal de nuestro estatuto no hace necesario probar una intención criminal específica para cometer el delito; es decir, "voluntariamente" no quiere decir "malévolamente" o "con intención maligna". Por otro lado, tampoco es cierto el otro extremo: no se establece el delito, como en el caso de adulteración de leche, demostrando simplemente que los hechos ocurrieron; es decir, la leche estaba adulterada, o como en este caso la man-

teca pesaba menos de lo que se desprendía de las facturas. Véanse *Pueblo* v. *Vázquez*, 26 D.P.R. 14; *Pueblo* v. *Díaz*, 62 D.P.R. 136.(¹)   Más bien al emplear la palabra "voluntariamente" este estatuto se sitúa en el término medio: aunque no se requiere una específica intención maligna o malevolencia, el delito, para ser voluntario, debe ser intencional, a sabiendas, deliberado u obstinado, según se distingue de accidental, por error o por desconocimiento.   *Zimberg* v. *United States,* supra, 137–8; *Kempe* v. *United States,* 151 F.2d 680, 688 (C.C.A. 8, 1945); véanse *El Pueblo* v. *Giraud,* 23 D.P.R. 531, 535; *State* v. *Lindberg,* 215 P. 41, 45 (Wash., 1923).   *Cf. Bowles* v. *Ammon,* 61 F. Supp. 106, 117 (Dist. Ct., Neb., 1945); *Bowles* v. *Ward,* 65 F. Supp. 880, 890 (Dist. Ct., Pa., 1946); *Bowles* v. *Krasno Bros. Glove & Mitten Co.,* 59 F. Supp. 581, 583 (Dist. Ct., Wis., 1945); *Bowles* v. *Pechersky,* 64 F. Supp. 641, 645 (Dist. Ct., Pa., 1946).   Y debe notarse que la intención, que es un estado de la mente, puede a veces inferirse de las circunstancias, siendo la teoría la de que una persona intenta las consecuencias naturales de sus propios actos.   *Cf. Pueblo* v. *Sánchez,* 60 D.P.R. 108, 110.

Quizá la corte de distrito erróneamente creyó que López y sus dos empleados que intervinieron en estas transacciones tienen automáticamente que ser declarados culpables por la mera demostración, como en el caso de la adulteración de leche, de que la manteca no tenía el peso completo. Pero el estatuto aquí envuelto provee que debe existir algo más: una demostración de infracción voluntaria, es decir, la violación intencional, a sabiendas, deliberada u obstinada.

(¹)El caso de *Díaz* es distinguible precisamente porque surgió bajo la Ley núm. 6, Leyes de Puerto Rico, 1941, Sesión Extraordinaria (pág. 15), que no exigía que un comerciante, para poder ser castigado criminalmente por un delito como el aquí envuelto, tenía que cometerlo voluntariamente. La Legislatura optó por cambiar, en lo que concierne a las sanciones penales, de la norma absoluta anterior hallada en la Ley núm. 6 de 1941, a la fórmula de voluntariedad expuesta en la Ley núm. 228 de 1942 según fué copiada de la ley Federal de 1942.

■■ Cuando aplicamos este concepto de infracción voluntaria a los hechos del presente caso, no encontramos base para las condenas de López. Queremos hacer constar que el mero hecho de que López no participó personalmente en estas transacciones, no lo exculparía por sí sólo, bajo la Ley núm. 228, de responsabilidad criminal bajo otras circunstancias. Por otro lado, contrario a los casos de adulteración de leche, él no es absolutamente responsable, haya o no participado. Más bien la fórmula es, cuando no participa personalmente, si hay alguna evidencia, bien directa o circunstancial, tendente a demostrar que sus empleados intencional o deliberadamente infringían la ley, por instrucciones suyas, o con su aprobación o aquiescencia. Aquí no hubo tal prueba o circunstancias. Por el contrario, toda la evidencia del Pueblo y las circunstancias concurrentes demuestran su deseo de deshacerse de esta manteca sin afrontar las dificultades que le ocasionaría la gente que clamaba por ella. En efecto López fué sentenciado por ser el dueño de un establecimiento en el que se vendía manteca bajo peso. Pero la Ley núm. 228, como hemos visto, no establece que esto sea un delito en ausencia de una infracción voluntaria de su parte.

De igual modo, no puede sostenerse la condena de Olivencia. Simplemente éste hacía las facturas y cobraba por la manteca. No participó en pesar ni en entregar la manteca. En verdad, no hubo prueba de que aun conociera que Bonilla estaba entregando manteca con peso de menos. El Pueblo alega que la división del trabajo entre Olivencia y Bonilla era parte de un plan ideado deliberadamente para relevar a López y a Olivencia de responsabilidad criminal. Este punto pudiera tener peso de existir alguna evidencia, directa o circunstancial, de la existencia de tal plan. La dificultad está en que la prueba fué al contrario: ésta era la práctica mercantil ordinaria y corriente del establecimiento.

En cuanto a Bonilla, aún suponiendo que hubiera algún peso de menos indeterminado en la manteca entregada por

él, no hubo prueba o circunstancia de las cuales se pudiera concluir que esto fué una acción deliberada o intencional, más bien que un error inocente, incurrido de buena fe, en la prisa de llenar cientos de órdenes de detallistas en pánico. Quizá se podría argumentar que por lo menos su convicción fué justificada, a no ser por las circunstancias de este caso —el intento de regalar la manteca; la solicitud de que se le enviara un policía que observara las ventas que se condujeron públicamente;(²) la ausencia de quejas; el hecho de que cientos de otros compradores recibieron el peso exacto; el no haber tomado precauciones adecuadas para proteger la manteca durante tres días con el resultado de que se bregó con ella durante dicho período; los defectos en el experimento para determinar su peso; y el hecho de que si hubiera actuado solo, Bonilla no hubiera tenido un posible motivo para entregar manteca bajo peso, ya que nunca intervino con el dinero envuelto en estas transacciones.

Aun aceptando toda la prueba del Pueblo como cierta, concluímos como cuestión de derecho que ninguno de los demandados deliberadamente y a sabiendas, v.g., voluntariamente, infringió la Ley Insular de Suministros y la Orden Administrativa Núm. 8. En vista de este resultado, creemos innecesario discutir los erreros tercero y cuarto.

Las cortes tienen una tarea importante que desempeñar en la guerra contra la inflación. El castigo por infracciones voluntarias de la Ley núm. 228 debe ser rápido, seguro y severo. Pero no es la función de las cortes someterse a la histeria general y crucificar al inocente.

*Las sentencias de la corte de distrito serán revocadas y se dictarán nuevas sentencias absolviendo a los acusados.*

---

(²)''En muy raras ocasiones un individuo comete públicamente un acto impropio con una intención voluntaria, toda vez que es de conocimiento general que los actos impropios de ordinario se cometen en secreto o de manera que no se sepa por el público en general.'' *Bowles* v. *Peckersky,* supra, 645.