832

PRUDENCIO PÉREZ NIEVES, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE CAGUAS, HON. J. VILLARES RODRÍGUEZ, JUEZ, recurrido.

Número 2253.

*Reasignado:* 9 de julio de 1958. *Resuelto:* 8 de junio de 1960.

*J. E. González Quiñones* y *Modesto Vázquez Suárez,* abogados del peticionario; *Hon. Secretario de Justicia Hiram R. Cancio (José Trías Monge, Ex Secretario de Justicia,* en el alegato) y *Rafael L. Ydrach Yordán* y *Augusto A. Saavedra Blasco, Fiscal* y *Fiscal Auxiliar del Tribunal Supremo,* respectivamente, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

El peticionario Prudencio Pérez Nieves fue convicto en la Sala de Caguas del Tribunal de Distrito de infracción al art. 263 del Código Penal (ed. 1937) por haber dejado de proveer alimentos sin justa causa a una niña de cuatro me-

ses de edad llamada Rosario Díaz. Bajo las disposiciones de la Ley 108 de 30 de abril de 1940 Hipólita Díaz acudió ante dicha Sala y juró que había llevado relaciones maritales con Pérez Nieves de las cuales le nació una hija, y que éste había dejado de proveerle alimentación. Requerido el peticionario según dispone la referida Ley 108, compareció ante el Juez de Distrito y negó ser padre de la niña. El Juez dispuso entonces que se siguieran los procedimientos ordinarios por abandono y descuido de menores, radicándose la correspondiente denuncia el 14 de junio de 1955.

La relación del caso sometida por el Juez de Distrito contiene la siguiente reseña de la prueba: La denunciante declaró que desde el año 1954 ella llevaba relaciones con el acusado Prudencio Pérez Nieves y en el mes de mayo de ese año quedó encinta y dio a luz en enero 26 de 1955; que el acusado le envió cinco dólares para la comadrona y le daba dos dólares semanales para la leche de la niña y otras veces se la mandaba de su tienda; que la niña enfermó y el acusado le dio tres dólares para llevarla al médico y además le compró las medicinas. La estuvo ayudando hasta el 11 de agosto(*) de 1955 y de allí en adelante no la atendió más. Dijo haberse casado con Miguel Angel Rivera el 9 de noviembre de 1953 sin que viviera con su marido y que desde enero de 1954 vivía con el acusado. María Luisa Dones declaró ser madre de crianza de la denunciante; que la niña nació en su casa y el acusado le dio cinco dólares para la comadrona. Después le mandaba la leche semanalmente. Que ella le había requerido para que apuntara la niña y él se había negado, y que su hija le había dicho que la menor era de él. La comadrona declaró que atendió el parto de Hipólita Díaz recibiendo cinco dólares por sus servicios, sin que ella se interesara en saber quién era el padre de la niña. Un testigo de defensa manifestó que la denunciante era ca-

---

(*) Así aparece en el original. Debe ser un error de transcripción ya que la denuncia se radicó en junio 14 y la vista del caso tuvo lugar en agosto 4, 1955.

sada con Miguel Angel Rivera y la vio con el esposo en un bar, creyendo el testigo, sin estar seguro, que ella estaba encinta. Otro, que conoció a Hipólita Díaz en el bar del acusado, la vio allí con su esposo Miguel Angel Rivera y vio a éstos juntos en Puerto Nuevo para julio y agosto de 1954. Un tercer testigo declaró en parecidos términos. El acusado manifestó que conocía a la denunciante desde hacía unos cinco años, sabía que era casada con Miguel Angel Rivera y la vio con su esposo en su negocio; que había tenido relaciones íntimas con ella una o dos veces y ella le dijo que estaba encinta. No supo hasta después de tres meses que ella tuviera un hijo. Se presentó en envidencia el certificado de matrimonio celebrado entre la denunciante y Miguel Angel Rivera de donde aparece que contrajeron nupcias el 7 de noviembre de 1953.

La defensa levantó la cuestión de derecho de que siendo casada la denunciante la presunción de ley era que su hija se reputaba de matrimonio, y que el Tribunal de Distrito no tenía jurisdicción por estar envuelta en este caso la impugnación de la paternidad. El Tribunal de Distrito dictó sentencia condenatoria apoyándose, en sus razonamientos, en la Ley 229 de 1942 y en lo decidido por este Tribunal en *Agosto v. Javierre*, 77 D.P.R. 471. No conforme con la sentencia condenatoria el peticionario apeló a la Sala de Caguas del Tribunal Superior, levantando como errores la cuestión jurisdiccional, así como que la sentencia era contraria a la prueba y no se ajustaba a la ley aplicable. Fundamentó este segundo error en que no se había demostrado la imposibilidad física del marido para tener acceso con la denunciante en los primeros 120 días de los 300 que precedieron al nacimiento de la niña, tal como dispone el art. 113 del Código Civil. El Tribunal Superior confirmó la sentencia considerando la apelación completamente frívola.

Expedimos certiorari para revisar este fallo. Por la peculiaridad que ofrece la decisión de *Agosto* v. *Javierre*, (¹) y considerando además el hecho de que el nacimiento en este caso ocurrió con posterioridad a la declaración constitucional prohibiendo establecer discrimen alguno por razón de nacimiento, —por el efecto jurídico, si alguno, de tal prohibición sobre el art. 113 del Código Civil (ed. 1930), —es hasta cierto punto de rigor una revisión de los antecedentes jurisprudenciales del problema que está ahora ante nos para dejar clarificada la doctrina aplicable en situaciones como las del presente caso.

En *Pueblo* v. *Ferrán*, 26 D.P.R. 263 (1918) nos enfrentamos por vez primera al problema de hijos procreados fuera de matrimonio, a los efectos del art. 263 del Código Penal. El artículo disponía en ese entonces que todo padre o madre de un niño que voluntariamente y sin excusa legal dejare de cumplir cualquiera de las obligaciones que la ley le impone, de proveerle del indispensable alimento, vestuario, o asistencia médica incurriría en *"misdemeanor"*. Interpretando dicho artículo en el sentido de que el mismo cubría solamente a los padres de los hijos legítimos y en ese caso se trataba de hijos extra matrimoniales, revocamos la

---

(¹) El Tribunal se dividió 4 a 3. El actual Juez Presidente, Sr. Negrón Fernández, al concurrir por separado en ese caso constituyendo el voto de mayoría para la sentencia que revocó y devolvió el caso, expresó lo siguiente:—77 D.P.R. págs. 475–476—"Por eso al concurrir con la revocación de la sentencia apelada y expresar mi conformidad con la doctrina por la que se reconoce en la opinión del Juez Asociado Sr. Ortiz el derecho del menor demandante a instar la acción filiatoria para buscar a su verdadero padre, no obstante el *status* de legítimo de que [goza] (*) bajo el Código Civil—todo en virtud y por efectos de la Ley 229—hago reserva en cuanto a algunos extremos que considero innecesariamente discutidos en dicha opinión, y expreso mi inconformidad en cuanto a otros, especialmente en cuanto a la necesidad de enmendar la demanda, pues en mi concepto y de acuerdo con el criterio expresado por mí en *Figueroa* v. *Díaz*, supra, la misma expone una causa de acción filiatoria que no requiere enmienda."

(*) Esta palabra aparece en la opinión unida al expediente del Tribunal.

sentencia que halló al padre culpable de abandono. Esa fue la situación hasta que en 1931 se enmendó el art. 263 por la Ley 35 de 24 de abril de ese año, tal como hoy reza, para hacer criminalmente responsable de abandono al padre o a la madre de un hijo legítimo, legitimado, natural o ilegítimo reconocido y adoptivo.([2])

El primer caso resuelto después de la enmienda en que estuvo envuelto un hijo no legítimo fue el de *Pueblo* v. *Rohena*, 52 D.P.R. 313 (1937). El acusado negó en juicio ser el padre de la menor y, convicto, alegó como error el que la corte le declarara padre natural sin haberse establecido con anterioridad al proceso bajo el art. 263 la relación de padre e hija natural por sentencia dictada en pleito de filiación, y sin que la filiación hubiese sido reconocida por documento indubitado. Rechazando el argumento dijimos que el hecho de la paternidad, o sea, la relación de padre e hija entre el acusado y aquella menor se podía propiamente establecer dentro de ese proceso criminal.

En *Pueblo* v. *López*, 54 D.P.R. 294 (1939) pasamos con más detenimiento sobre la enmienda de 1931 al art. 263, a la luz del problema de la filiación no legítima, ante una situación de hijos adulterinos en el concepto que tales hijos tenían en la legislación anterior a la Ley 229 de 12 de mayo de 1942. 31 L.P.R.A. sec. 501. No aceptamos la alegación del acusado al efecto de que no se le podía condenar por abandono, tratándose de hijos adulterinos, sin haberse demostrado la existencia de una sentencia firme dictada en proceso civil o criminal de la cual se infiriera su paternidad, o la existencia de un documento indubitado en que se reconociera la filiación, según disponen los arts. 128 y 129 del Código Civil;([3]) ni aceptamos la alegación de que el establecimiento

---

([2]) Art. 263 Cód. Penal (ed. 1937)—33 L.P.R.A. sec. 991.

([3]) Artículo 128 Cód. Civil (ed. 1930)—31 L.P.R.A. sec. 507.

"Los hijos ilegítimos en quienes no concurra la condición legal de naturales, sólo tendrán derecho a exigir de sus padres alimentos, conforme al artículo 143."

de la paternidad debía ser un hecho anterior y preexistente a la reclamación de alimentos. Interpretando la referida enmienda el entonces Juez Presidente Sr. Del Toro se expresó así:

"Los hijos ilegítimos se dividen en dos clases, a saber: hijos nacidos fuera del matrimonio pero de padres que al tiempo de su concepción hubieran podido casarse, e hijos nacidos fuera del matrimonio de padres que al tiempo de su concepción no hubieran podido contraerlo. Los primeros se llaman naturales y es para ellos que la ley establece la acción de reconocimiento. Artículos 125, 126 y 127 del Código Civil, ed. 1930. Para los segundos no hay tal acción. Sólo les reconoce la ley civil—artículo 128 del Código—el derecho a ser alimentados por sus padres de acuerdo con lo dispuesto en el artículo 143.

"No hay duda de que la palabra reconocidos usada por el legislador en relación con el hijo ilegítimo en la ley penal—artículo 263 del Código Penal, ed. 1937—lo fue por inadvertencia. Pero partiendo de la base de su existencia entendemos que significa que sólo se comete el delito cuando lo es por un padre que pudiendo deja de alimentar a hijos ilegítimos que ha tenido pública o privadamente como tales o que por ser sus hijos en realidad de verdad se hubiera visto obligado a reconocer si concurriera en ellos la condición de naturales, y dando a lo prescrito en el Código Civil—artículo 129—una interpretación razonable, en armonía con la enmienda legislativa de la ley penal de 1931 (Ley núm. 36 de 1931, pág. 353), entendemos que la sentencia dictada en un proceso criminal a que se refiere puede ser la que se dicte dentro del proceso criminal que por abandono del hijo ilegítimo se siga como se siguió en este caso.

"Dentro del estado actual de nuestro derecho, la sentencia dictada en proceso criminal a que se refiere el repetido artículo no puede ser otra que la que se dicte en la causa criminal por abandono donde todos los hechos esenciales pueden quedar debidamente establecidos. La obligación del padre surge del he-

---

Artículo 129 Cód. Civil (ed. 1930)—31 L.P.R.A. sec. 508.
"El derecho a los alimentos de que habla el artículo anterior, sólo podrá ejercitarse:
1. Si la paternidad o maternidad se infiere de una sentencia firme dictada en proceso criminal o civil.
2. Si la paternidad o maternidad resulta de un documento indubitado del padre o de la madre, en que expresamente reconozca la filiación".

cho sustancial de serlo. Probado en debida forma que lo es y que siéndolo dejó de cumplir su obligación en la manera que la ley penal establece, el delito debe entenderse cometido."

La responsabilidad legal del padre bajo el art. 263 de alimentar al hijo ilegítimo, pudiera o no exigir éste su reconocimiento bajo la ley entonces en vigor, quedó asentada únicamente en la filiación natural, en el hecho de ser hijo, la relación misma entre generantes y generados, sin tomarse en cuenta aquellas otras normas del derecho de familia que conducían a la filiación jurídica basada en actos de reconocimiento o en la conducta y proceder de los padres. Como secuela lógica de ello quedó firmemente establecido que esa relación natural entre procreantes y procreados—la paternidad—estaba abierta a investigación judicial, y podía determinarse en el propio proceso bajo el art. 263.(4)

El caso de *López* tuvo más amplia significación ya que su doctrina se hizo extensiva, en *Rivera* v. *Cardona*, 56 D.P.R. 819 (1940), a una acción civil de alimentos incoada por primera vez—lógicamente puede pensarse que inspirada en esa decisión y en la de *Rohena*—por un hijo ilegítimo que en ese entonces no tenía la condición de hijo natural, y quien no hubiera podido instituir una acción filiatoria. El problema que ahora surgía, con el cual no nos habíamos confrontado antes, era el de si un hijo así ilegítimo podía instituir una acción civil reclamando alimentos contra su alegado padre sin que previamente constara la paternidad en virtud de sentencia firme en proceso civil o criminal o resultara de documento indubitado reconociendo expresamente la filiación, se-

---

(4) Véanse: *Pueblo* v. *Rotger*, 55 D.P.R. 139 (1939); *Pueblo* v. *Pérez*, 55 D.P.R. 677 (1939); *Pueblo* v. *Saldaña*, 55 D.P.R. 918 (1940); *Pueblo* v. *De Jesús*, 57 D.P.R. 708 (1940); *Pueblo* v. *Calzada*, 58 D.P.R. 507 (1941); *Pueblo* v. *Emanuelli*, 61 D.P.R. 209 (1942); *Pueblo* v. *Bernabe*, 63 D.P.R. 400 (1944); *Pueblo* v. *Cáceres*, 65 D.P.R. 368 (1945); *Pueblo* v. *Avilés*, 66 D.P.R. 290 (1946); *Pueblo* v. *Santiago*, 67 D.P.R. 86 (1947); *Pueblo* v. *Rodríguez*, 67 D.P.R. 735 (1947); *Pueblo* v. *Méndez*, 67 D.P.R. 824 (1947); *Pueblo* v. *Ortiz*, 67 D.P.R. 903 (1947); *Pueblo* v. *Mercado*, 69 D.P.R. 335 (1948); *Pueblo* v. *Suárez*, 70 D.P.R. 461 (1949); *García* v. *Acevedo*, 78 D.P.R. 611 (1955).

gún lo dispuesto en los arts. 128 y 129 del Código Civil. Siguiendo el razonamiento del caso de *López*, expresó este Tribunal por voz del Juez Sr. De Jesús que el derecho de alimentos está tan íntimamente relacionado con la *determinación de la paternidad*, que no veíamos razón alguna que impidiera resolver toda la controversia en un solo procedimiento, ya se dirija éste *a la declaración de la paternidad* y como un incidente del mismo se reclamen alimentos, o ya se tratara, como en ese caso, de una reclamación de alimentos *donde incidentalmente se establezca la paternidad*. Al igual que en los procesos bajo el art. 263 del Código Penal, el derecho de los hijos ilegítimos a recibir alimentos civilmente descansó en el hecho único de la procreación a ser probado en el propio procedimiento, sin tomarse en cuenta para concederlos otras consideraciones en torno a la filiación ni tampoco el derecho a ser reconocido, y aun cuando éste fracasara o no procediera.(5)

Hasta este caso de *Cardona* y en prácticamente todos los demás que le siguieron, nuestras decisiones civiles y criminales respecto a los alimentos de la procreación ilegítima no reconocida tuvieron que ver todas, o con hijos naturales de padre y madre solteros al ser concebidos o con hijos adulterinos procreados de hombre casado en *mujer soltera*. En *Pueblo* v. *Santiago*, 70 D.P.R. 837, decidido en el año 1950, se nos presentó por primera vez, como de nuevo ahora, el caso de alimentos de un alegado hijo adulterino habido de *mujer casada*, nacido en 1941 después de los 180 días siguien-

---

(5) *Falcón* v. *Cruz*, 67 D.P.R. 530 (1947); *Rosario* v. *Suárez*, 67 D.P.R. 589 (1947); *Pueblo* v. *Rodríguez*, 67 D.P.R. 735 (1947); *Pueblo* v. *López*, 67 D.P.R. 780 (1947); *Cerra* v. *Corte*, 67 D.P.R. 929 (1947); *Rodríguez* v. *Cruz*, 68 D.P.R. 751 (1948); *Vargas* v. *Jusino*, 71 D.P.R. 389 (1950); *Molini* v. *Tribunal de Distrito*, 72 D.P.R. 945 (1951); Cf: *Armaiz* v. *Santamaría*, 75 D.P.R. 579 (1953). *Véase* la Ley 108 de 1940 y los siguientes casos interpretando la misma: *Pueblo* v. *Lamboy*, 59 D.P.R. 174 (1941); *Pueblo* v. *Emanuelli*, 61 D.P.R. 209 (1942); *Pueblo* v. *Ramos*, 61 D.P.R. 333 (1943); *Rosario* v. *Suárez*, 67 D.P.R. 589 (1947); *Pueblo* v. *Méndez*, 67 D.P.R. 829 (en reconsideración) (1947); *Maldonado* v. *Bravo*, 73 D.P.R. 206 (1952).

tes al del matrimonio de la madre y antes de los 300 días siguientes a su disolución por divorcio. Se condenó al supuesto padre natural por abandono de dicho menor e independientemente de la prueba aducida que tendió a establecer que el acusado era el padre, lo exoneramos de responsabilidad criminal a tenor de lo dispuesto en los arts. 113 y 116 del Código Civil.(6) Expresamos esta vez por voz del propio Juez Sr. De Jesús:

. . . "Pero aparte de eso, tratándose en este caso de una acción criminal no puede impugnarse dentro de este procedimiento la presunción de legitimidad. A este efecto, el artículo 116 del Código Civil prescribe que la legitimidad puede ser impugnada solamente por el marido o sus legítimos herederos. Al especificar el Código quiénes pueden impugnar la legitimidad, naturalmente, excluyó a aquéllos que no mencionó en el citado artículo. Si hubiera sido la intención del legislador investir al Estado con la facultad de impugnar la legitimidad, fácil le hubiera sido hacerlo. *Ex parte Madalina,* 164 Pac. 348 (Cal., 1917).

"Podría argüirse que la limitación en cuanto a quiénes pueden impugnar la legitimidad se halla en el Código Civil y que no encontrándose igual disposición en el Código Penal, lo prescrito en el artículo 116 no es aplicable a procedimientos criminales. Ese argumento sería insostenible porque el artículo 116 declara la política pública del Estado en relación con la impugnación de la legitimidad y naturalmente esa política no debe variar con la clase de procedimiento que se establezca."

Igual norma de derecho se aplicó poco después en *Pérez* v. *Rosario,* 72 D.P.R. 514 (1951) en situación parecida ante

(6) *Artículo 113 Cód. Civil* (ed. 1930)—31 L.P.R.A. sec. 461. "Son hijos legítimos los nacidos después de los ciento ochenta días siguientes al de la celebración del matrimonio y antes de los trescientos días siguientes a su disolución.

Contra esta legitimidad no se admitirá otra prueba que la imposibilidad física del marido para tener acceso con su mujer en los primeros ciento veinte días de los trescientos que hubiesen precedido al nacimiento del hijo."

*Artículo 116 Cód. Civil* (ed. 1930)—31 L.P.R.A. sec. 464. "La legitimidad puede ser impugnada solamente por el marido o sus legítimos herederos. Estos sólo podrán impugnar la legitimidad del hijo en los casos siguientes:"

una reclamación civil de alimentos. Distinguiendo las decisiones anteriores, dijimos al confirmar la sentencia que desestimó la demanda: "Aquí la paternidad de la hija está establecida por la ley—artículo 113 Código Civil, supra—como hija legítima del marido de la apelante."

Tal era el estado de nuestra jurisprudencia, que nos permitiría disponer ya de este caso sin ulterior consideración del problema. Pero en 1954 se resolvió el de *Agosto* v. *Javierre*, en el que en opinión suscrita por 3 de los 7 jueces entonces presentes se revocó el caso de *Santiago* junto con el de *Pérez* v. *Rosario*. Ello hace imperativo, antes de continuar con la discusión del asunto ante nos, que entremos en ciertas consideraciones sobre cuál fue en realidad el efecto del caso de *Javierre*, a la luz de sus propios pronunciamientos, sobre la manera en que dispusimos del caso de *Santiago*. *Agosto* v. *Javierre* se originó como una reclamación civil de alimentos únicamente, en circunstancias iguales a las del caso de *Pérez* v. *Rosario*. Habiendo nacido el menor envuelto en el caso de *Rosario* en 1950, y tratándose igualmente de una acción civil, es aparente que esta decisión resultaba en conflicto con el tratamiento que la mayoría del Tribunal dio luego a la misma situación en el de *Javierre*. No era así precisamente en lo que respecta al caso de *Santiago* donde, por tratarse de un procedimiento criminal, la acción de alimentos nunca hubiera podido convertirse en sí misma en una *acción filiatoria* y en donde no había envuelto problema alguno de "reconocimiento judicial." (Véase escolio 1).[7] Tomando la revocación del caso de *Santiago* como un pronunciamiento de mayoría, la disposición que del problema ahora ante nos se hizo en dicho caso no fue descartada ni en

---

[7] El Juez Asociado entonces Sr. Negrón Fernández expresó su conformidad con la doctrina de la opinión mencionada por la que se reconocía el derecho del menor *a instar acción filiatoria* para buscar a su verdadero padre [para cuyo fin se le estaba reconociendo al menor la facultad de impugnar su paternidad legítima], haciendo reserva el Juez Sr. Negrón Fernández sobre otros extremos de dicha opinión.

forma alguna quedó alterada por lo decidido en *Javierre*, según surge de las propias expresiones de la opinión del Juez Sr. Ortiz. Para que pudiera tener significación y eficacia la acción filiatoria reconocida por la Ley 229 de 1942 a todos los hijos ilegítimos, la mayoría de este Tribunal llegó a la conclusión que dicha Ley había enmendado implícitamente el art. 116 del Código Civil para permitir también al hijo impugnar la paternidad legítima en busca del reconocimiento de su verdadero padre. Se dice en la opinión (77 D.P.R. a la página 496) que *en esta clase de casos* [el de un hijo adulterino antes y entonces natural, pero nacido de madre casada], la acción predominante debe ser la de filiación, y la reclamación de alimentos debe considerarse incidental a la acción filiatoria porque, para que pueda tener éxito la reclamación de alimentos contra el alegado padre verdadero, que no es el esposo de la madre, se haría preciso el establecer la paternidad, o sea la relación de padre e hijo, lo cual envolvía necesariamente la impugnación de la paternidad del marido, siendo la destrucción del estado prevaleciente de legitimidad un efecto necesario del éxito de la reclamación de alimentos. Se dijo que sería irrazonable el resultado que se produciría de establecerse el derecho de alimentos contra el allí demandado a base de que éste era el padre del demandante, y al mismo tiempo conservar el demandante su estado como hijo legítimo del esposo de la madre. Y que de limitarse la controversia al derecho a alimentos el demandante estaría perdiendo un estado de legitimidad sin establecer una nueva filiación. La proposición básica envuelta debía ser, sigue exponiendo *Javierre*, la de la relación filial del menor y la de la identificación de su verdadero padre, y el derecho de alimentos surgiría entonces de la filiación, la cual debe establecerse previamente. A la luz de las anteriores consideraciones fue el criterio de este Tribunal que el asunto debía devolverse al Tribunal de instancia para que el caso, que había surgido como uno de ali-

mentos, se tramitara como una acción filiatoria, a los fines de evitar que el estado jurídico del menor quedara en un vacío. Se observará que nada de lo anteriormente dicho está en conflicto con la disposición en sí del problema ante nos que el Tribunal hizo en el caso de *Santiago*. Pero aún más. Con mayor pertinencia al caso que nos ocupa, la propia opinión de *Javierre* expresa: "Como secuela de las anteriores normas, debemos indicar, colateralmente, que en una situación como la del caso de autos, no debería tramitarse una reclamación criminal de abandono o de reclamación de alimentos sin que antes se haya establecido la verdadera filiación del reclamante en un procedimiento civil a tal efecto."

La decisión de *Javierre* no se proyecta jurídicamente más allá de su propio contexto, en relación con la Ley 229 de 1942. Al resolverse que este estatuto hubo de modificar implícitamente el art. 116 del Código Civil de modo que los propósitos de esa legislación fueran cumplidos, no se destruyeron aquellas normas de nuestro derecho que históricamente, y por razón de un superior interés social, han salvaguardado la integridad de la familia en nuestra cultura. Considerando el art. 116 a la luz de la Ley 229 de 1942, se extendió la facultad de impugnar la paternidad legítima sólo al propio hijo en circunstancias en que éste tratara de establecer su verdadera filiación, y como un medio necesariamente incidental a un reconocimiento que ya, por la Ley 229, le era dable gestionar judicialmente. La facultad de impugnación no le fue extendida a la madre aun cuando ella actuaba en representación y para beneficio del hijo, ni se le reconoció a persona o entidad otra alguna. Por el contrario, seguimos la norma sentada en *Chabrán* v. *Méndez*, 74 D.P.R. 768, ante la presencia de un posible conflicto de interés entre madre e hijo. Surge de todo lo anterior que el fundamento de ley que sirvió de base a la decisión de *Pueblo* v. *Santiago* subsiste aún, no sólo por el hecho de que la legislación no ha sido alterada, sino en virtud también de los propios pro-

nunciamientos de *Javierre*, y por la circunstancia de que aquel procedimiento penal instituido por el Estado no envolvía problema alguno en cuanto al derecho del hijo mismo a impugnar su paternidad de ley como medio de obtener un reconocimiento que permitió la legislación del 1942, que fue lo que este Tribunal hizo prevalecer en *Javierre* como lo fundamental y principal, quedando relegada la cuestión de alimentos a un plano secundario incidental a la filiación a establecerse. *Agosto* v. *Javierre* no tiene el efecto jurídico atribuídole por los magistrados de primera instancia que entendieron en este caso, ni se proyecta, según dijimos, más allá de su propio ámbito, y a pesar de la expresión revocatoria, tampoco dejó la doctrina sentada en *Pueblo* v. *Santiago* desprovista de su razón de ley. Finalmente, cualquier duda sobre el particular hubo de quedar disipada en *Pérez* v. *Torres*, 79 D.P.R. 611, decidido no mucho después en 1956, donde surge claramente el alcance limitado de la modificación que sufrió el art. 116. Aun en las circunstancias extremas que surgen de los hechos de este último caso, no le permitimos a un padre natural impugnar la paternidad legítima en su empeño por establecer su condición de verdadero padre sobre una hija suya habida de mujer casada.[8] Clarificado lo ocurrido con *Javierre*, conviene observar que la doctrina de *Pueblo* v. *Santiago* ha sido la aplicada y seguida por las cortes americanas en situaciones análogas. En *In re Madalina*, 174 Cal. 693, 164 Pac. 348 (1917), citado por el Juez Sr. De Jesús, la Corte Suprema de California (in bank),

---

[8] En este caso la hija aparecía inscrita como legítima de la madre y de su esposo. El padre natural pidió la nulidad de dicha inscripción y que se inscribiera como hija natural suya. Demandó a la hija, a la madre y al esposo, alegando que procreó a la menor mientras vivía en público concubinato con la madre casada de la niña, que había tenido a la menor en posesión continua de estado de hija natural y la había atendido y alimentado igual que a sus hijos legítimos. El *esposo* demandado compareció en una contrademanda alegando esos mismos hechos y reproducía la súplica, a lo cual el demandante a la vez se allanó. No obstante esas circunstancias negamos causa de acción al padre natural, aplicando los artículos 113 y 116.

considerando las secs. 193, 195 y 196 (a) del Código Civil de dicho Estado, (⁹) excarceló mediante hábeas corpus y exoneró a un detenido para responder de delito por el abandono de un hijo ilegítimo habido de mujer casada, que fue acusado de violar el art. 270 del Código Penal, equivalente al 263 nuestro, según se había enmendado dicho artículo poco antes en 1915 para incluir en sus disposiciones a la procreación ilegítima. Se estipuló que en el examen preliminar la madre había declarado sobre la falta de acceso carnal de ella con su marido o con otra persona, excepto el acusado, durante los dos años inmediatamente anteriores al nacimiento del hijo. No obstante reconocerle California a *la madre* el derecho a impugnar la legitimidad del hijo, y al propio *hijo* también como descendiente de ella, su Corte Suprema se expresó así en dicho caso:

"Estamos satisfechos de que la posición del abogado del peticionario es correcta, y que cualquier alegación en contrario se contesta tomando en cuenta simplemente la sección 195 del Código Civil, la cual dispone que la presunción de legitimidad de un hijo nacido dentro del matrimonio puede ser cuestionada solamente por el marido o la mujer o por los descendientes de alguno de ellos. Esta es la política declarada del estado y es simplemente la adopción de una norma generalmente prevaleciente en todas las comunidades civilizadas. . . . El abogado del querellado sostiene vigorosamente que la sección 195 del Código Civil es inaplicable, porque la acción criminal bajo la sección 270 se encuentra en el Código Penal que rige en cuanto a todos los procesos criminales. Pero este argumento no es sólido. *Un mero lugar en los códigos no es decisivo de los efectos o de la aplicación de las disposiciones del código. El Código Civil, por la sección 195 estaba sentando una norma de política pública en una materia que el estado estimó vital a la sociedad;*

---

(⁹) La sec. 193 dispone que se presumen legítimos los hijos nacidos dentro del matrimonio. La sec. 195, antes de ser enmendada en 1955, estatuía que dicha presunción de legitimidad sólo podía ser impugnada por el marido, *la mujer* o los descendientes de cualquiera o de ambos de ellos. La sec. 196 (a) impone a los padres de un hijo ilegítimo el deber de sostenerlo y permite a la madre instituir una acción civil contra el padre en beneficio de tal hijo para hacer valer dicha obligación.

*estaba siguiendo la norma civilizada y la hizo aplicable bajo todas las circunstancias en donde la cuestión de la legitimidad de hijos nacidos dentro del matrimonio se tratara de suscitar,* prescribiendo una limitación en cuanto a las personas que pudieran levantar la cuestión al enumerar expresamente a aquellos que podían así hacerlo; . . . (Énfasis adicionado.) Cuando hubo que proveer para los procedimientos bajo la sección 270 la legislatura no abrogó en lenguaje alguno que ahí se encuentre, o en ninguna otra parte, lo que había dispuesto en la sección 195 en cuanto a cuestionar la legitimidad de un hijo nacido dentro del matrimonio. Esta sección 195 ha de considerarse con la sección 270 como *in pari materia* con esta última y debe interpretarse como parte de ella. . . .

Pero se dice por el abogado del querellado que la autoridad para levantar la cuestión de legitimidad cuando el hijo nace dentro del matrimonio debe sobrentenderse de la promulgación de la sección 270 autorizando el proceso criminal; que tal procedimiento sólo puede traerse en nombre del estado. Cierto, el proceso criminal debe ser en nombre del estado—el pueblo— y está autorizado para castigar al padre de un hijo ilegítimo o legítimo por la omisión sin excusa de mantenerlo. Pero cuando se intenta traer dentro de sus términos en un proceso criminal la cuestión de la legitimidad de hijos nacidos dentro del matrimonio no hay nada directamente o por inferencia en el lenguaje de la sección 270 que autorice al estado a levantar esa cuestión. Por el contrario, la política expresamente manifestada del estado según se encuentra en la sección 195 le impide de así hacerlo, y en interés de la política pública, decencia, moral, y de la protección de hijos inocentes esto por sí mismo es loable. . . ."

Hasta donde hemos podido ver en las decisiones americanas, los anteriores pronunciamientos con frecuencia han sido adoptados como suyos y seguidos por otras cortes estatales de última instancia como una norma de incuestionable aceptación. ([10])

---

([10]) Véase: *Monografía* en 1 A.L.R., 1632 (1917) y la *Monografía* suplementaria en 53 A.L.R.2d 572 (1955). Véanse además: *State* v. *Coliton,* 17 N.W.2d 546 (1945); *State* v. *Reed,* 149 S.E. 669 (1929); *State* v. *Fury,* 205 N.W. 877 (1925); *Commissioner of Public Welfare* v. *Koehler,* 30 N.E.2d 587 (1940); *State* v. *Randall,* 53 So.2d 689 (1951); *State* v.

Al reafirmar una vez más estos principios, cabe apuntar que la disposición que hicimos del caso de *Pueblo* v. *Santiago* tiene además otra razón de ser en ley. Históricamente considerado, resulta un tanto incierto y dudoso el hecho, en ausencia de alguna expresión legislativa que tendiera a demostrar lo contrario, de si al enmendarse en 1931 el art. 263 del Código Penal y luego al aprobarse la Ley 108 de 1940, pudo haberse tenido en mente dentro del concepto de "ilegítimo" y quedar incluido un hijo que, según la legislación existente la cual no cabe presumir que el legislador ignorara, no caía bajo tal denominación porque ostentaba una paternidad legítima reconocida en ley desde su nacimiento y por razón de ese hecho. Máxime, si se tiene en cuenta que distinto a lo ocurrido en algunos estados en donde ha habido legislación autorizando en determinadas circunstancias una reclamación de alimentos bajo sanción penal, en situaciones similares a

---

*Lemoine,* 69 So.2d 15 (1953); *State* v. *Jones,* 56 So.2d 724 (1951); *Jenkins* v. *Aetna Casualty & Surety Co.,* 158 So. 217 (1935); *In re Findlay,* 170 N.E. 471 (1930); *Gonzales* v. *Pacific Greyhound Lines,* 209 P.2d 598 (1949); *Serway* v. *Galentine,* 170 P.2d 32 (1946); *In re Tinker's Estate,* 215 Pac. 779 (1923); *Miller* v. *Tyndall,* 212 Pac. 989 (1923); *Graham* v. *Lee,* 37 So.2d 735 (1948); *County of Santa Clara* v. *Doll,* 337 P.2d 582 (1959); *Kowalski* v. *Wojtkowski,* 116 A.2d 6 (1955). Estos casos, entre otros, ofrecen una amplia discusión de las normas que rigen en la jurisprudencia angloamericana sobre la impugnación de la paternidad legítima de los hijos, según se han desarrollado desde su punto de partida histórico del derecho común (Regla de Lord Mansfield) a través de la legislación positiva adoptada sobre el particular por los distintos estados. Particularmente ilustrativas de estas normas son las opiniones del caso de *Kowalski* v. *Wojtkowski,* supra, donde New Jersey se negó a permitir que bajo sus propios procedimientos, una madre allí residente reclamara alimentos contra un supuesto padre natural también residente, para hijos nacidos en Florida mientras ella era casada con otra persona, bajo la doctrina de que en Florida, donde nacieron los niños, a la madre no le era permitido impugnar la paternidad legítima de ellos. La presunción de que los hijos nacidos dentro del matrimonio son legítimos es de general aplicación en los estados. Las decisiones demuestran diversos criterios más bien en cuanto a cómo y quiénes pueden destruir dicha presunción a tenor de la política pública de cada estado según su legislación. No obstante, no hemos encontrado autoridad sosteniendo que la legislación general del estado sobre este particular, por el solo hecho de ser de carácter civil, no sea igualmente aplicable en casos penales o en cualquier otro procedimiento con un fin especial en que se suscite la cuestión.

la presente, contra un alegado padre que no es o era el esposo, nuestro legislador no ha permitido tal cosa siquiera cuando adoptó un estatuto especial para hijos ilegítimos como la Ley 108. Pero aparte cualquier duda en cuanto a si tales hijos quedaban incluidos en el estatuto penal mientras ostentaran una paternidad legítima, la responsabilidad criminal impuesta por ley bajo el art. 263 descansa también, al igual que dicha paternidad legítima, en el hecho de la procreación del hijo por aquel que se considera ser el padre. [11]

Es evidente, según puede apreciarse de varios de los casos citados, que *como cuestión de derecho* no se puede demandar responsabilidad criminal contra otra persona que no sea

[11] El art. 108 del Código Civil español dispone que los hijos nacidos en el plazo que señala *se presumirán* legítimos. Nuestro Código, acercándose más a la máxima del derecho romano *"pater est is quae nuptiae demostrant"*, declara en su equivalente el 113 que los hijos *son* legítimos, aunque al igual que en el Código español se permite determinada prueba de carácter exclusivo en contra del hecho declarado. La razón científica del art. 113 surge de la *viabilidad* del nacido basada en la doctrina de Hipócrates, seguida por el médico Fourcroy al redactarse el Código de Napoleón y en las demás legislaciones, doctrina ésta a la cual Manresa se refiere así: (Comentarios al Código Civil Español, Tomo 1, pág. 643, 7a. ed.). "El razonamiento del legislador ha sido conforme a los textos romanos (Ulpiano, Digesto, ley 3.ª, tít. 16, libro 38), que copia el de las Partidas en esta forma: 'Ipocras fue un filósofo en arte de la física, e dijo que lo más que la mujer preñada puede traer la criatura en el vientre son diez meses . . . Otro sí dijo este filósofo que la criatura que nasciese fasta en los siete meses, que sólo que tenga su nacimiento un día del seteno mes, que es complida y vividera'; por tanto, en uno y otro caso ha podido ser, naturalmente, engendrada por el marido." Véanse: Puig Peña, Tratado de Derecho Civil Español, Tomo II, Vol. II, págs. 15–32; Sentencia del Tribunal Supremo de España de 24 de enero de 1947 y otras reseñadas por Medina y Marañón, Leyes Civiles de España, al margen de los arts. 108 y siguientes del Código Civil; Manresa, *obra citada*, págs. 649–657.

En vista de que el peticionario hace un segundo planteamiento de hecho en el sentido de que la prueba practicada no demostró la imposibilidad física del marido para tener acceso carnal con la denunciante, debemos aclarar que no estamos considerando dicho planteamiento ni anticipando juicio sobre la aplicación a las reclamaciones criminales de lo dispuesto en el segundo párrafo del art. 113 referente a la naturaleza y exclusivismo de la prueba permisible para impugnar la legitimidad, o a cualquier otra acción civil instituida por el hijo en que esté envuelta la impugnación.

el padre que la ley reconoce y en quien recae la responsabilidad de alimentar, mientras esta paternidad subsista y no haya desaparecido, a menos que la misma pudiera quedar legalmente impugnada o destruida por la sentencia dictada en el propio proceso penal, lo cual aquí no es posible bajo nuestro estado de legislación.([12])

La precedente conclusión no está en pugna con nuestros casos anteriores que envolvían hijos de madres solteras carentes ante la ley de un padre en quien hacer valer la responsabilidad criminal del art. 263. Permitimos probar en ellos quién era tal padre. A la luz de esa situación de hecho y de ley deben entenderse los pronunciamientos de esos casos.

Esta decisión no prejuzga en un sentido o en otro la cuestión de la paternidad de la menor. Incuestionablemente ella tiene derecho a instituir una acción civil sobre declaración de paternidad y alimentos contra el aquí peticionario y demostrar que él es su padre, aunque vaya envuelta la impugnación de la paternidad de ley. (*Agosto* v. *Javierre,* sólo que dada la fecha de su nacimiento ocurrido después de proclamada la Constitución, no viene obligada a tramitar una acción filiatoria bajo el art. 125). Mientras no se modifique la legislación en vigor, la acción a seguirse debe permitirle en ley cambiar de un estado filiatorio al otro con la debida adjudicación de los derechos de todas las partes afectadas, inclusive, cualquier conflicto de interés entre la menor y su propia madre ya que como consecuencia de la reclamación dejará de pertenecer a una familia con todos los derechos que en ella le corresponden para formar parte de otra distinta con otros derechos o sin ninguno de ellos.

---

([12]) Treinta y ocho años después de estar rigiendo la decisión de *Madalina,* supra, California en 1955 afrontó la situación enmendando la sec. 195 del Código Civil. Dispuso que la presunción de legitimidad puede ser impugnada solamente "por el pueblo del Estado de California en una acción criminal instituida bajo las disposiciones de la Sección 270 del Código Penal", o por el marido, etc. (Enmienda entrecomada.)

■ Según hemos visto esta menor nació vigente ya el mandato constitucional que prohibe establecer discrimen alguno por razón de nacimiento. Debemos hacer constar que el art. 113 del Código Civil no quedó sin efecto, *ipso jure,* por dicha disposición constitucional. Si tal fuera el caso la sentencia revisada debería confirmarse sin más como cuestión de derecho, de estar los hechos sostenidos por la prueba. El art. 113 no establece por sí mismo discrimen y su referencia a *"hijos legítimos"* no crea para los nacidos a partir del 25 de julio de 1952 diferencia alguna entre hijos de un mismo padre, en vista de lo estatuido en la Ley 17 de 20 de agosto de 1952, disponiendo que todos los hijos tienen respecto a sus padres y a los bienes relictos por éstos, los mismos derechos que corresponden a los hijos *"legítimos".* Dicho artículo no tiene otro efecto en este caso sino aquel que ha sido su fundamento: declarar hijos del marido o esposo de la madre a los nacidos de ella dentro del período allí prescrito. Como expresión de una política pública basada en la antigua máxima *"pater est is . . ."* que con una que otra modalidad vemos consagrada en el derecho de familia en todos los códigos, el art. 113 no ofrece conflicto alguno con el pensamiento constitucional de dignificación del ser humano en la igualdad de los hijos.

Tratándose de los alimentos de un niño, no se nos oculta ahora tampoco el aspecto urgente y esencialmente práctico del problema. Nuestras decisiones demuestran que siempre estuvimos muy conscientes de este interés del menor. No obstante, en casos como el presente de un menor nacido de mujer casada dotado por ley de una paternidad, —y lo que aquí se decide sólo cubre esta situación, —otro interés social manifestado a través de una clara y bien definida política legislativa impide en derecho el uso de los procedimientos bajo el art. 263 del Código Penal y la Ley 108 de 1940. Corresponde más propiamente a la Legislatura ofrecer la solución deseable en este tipo de casos a la luz de los distintos

intereses sociales envueltos, como así lo han hecho las legislaturas de muchos otros estados donde ha surgido análoga situación.

*Por los fundamentos anteriormente expuestos, se anula la sentencia recurrida y se devuelven los autos al tribunal sentenciador con instrucciones de que se ordene el archivo y sobreseimiento definitivo de esta acción criminal.*

---

Opinión disidente del Juez Asociado Sr. Serrano Geyls, en la cual concurren los Jueces Asociados Sres. Saldaña y Hernández Matos.

Para disipar las tinieblas que a mi juicio crea la opinión del Tribunal, es indispensable aclarar de inmediato de lo que trata y de lo que no trata este recurso de *certiorari*. Trata de una acción penal incoada al amparo de la Ley núm. 108 de 30 de abril de 1940 (*Leyes*, pág. 673; 31 L.P.R.A. secs. 509–514) mediante la cual el estado le imputa al aquí peticionario la comisión del delito de abandono de menores por haber faltado a su obligación de "alimentar, vestir, sostener, educar y procurar albergue" (sec. 1) a un hijo engendrado por él en una mujer casada con otro hombre. Por disposición expresa de la ley esa obligación existe en cuanto a los "hijos ilegítimos, fueren o no reconocidos" (sec. 1) y se asienta exclusivamente en el hecho de la paternidad (secs. 3, 4, 5 y 6). La prueba de ese hecho no tiene que ajustarse a lo dispuesto en el Código Civil sobre las acciones de filiación. Es obvio, además, que el carácter penal de la acción no desaparece ni se atenúa por la circunstancia de que la ley permita al juez sentenciador suspender la sentencia "bajo las condiciones que tuviere a bien imponer, en bienestar del menor abandonado o desamparado. . ." (sec. 6.) El sistema de sentencias suspendidas es ya una parte vital de nuestro enjuiciamiento que tiene vigencia en un gran número de delitos, pero que en modo alguno altera o modifica el carácter penal de las acciones. 34 L.P.R.A. secs. 1027; *Pueblo* v. *Vélez*, 76 D.P.R. 142, 148 (1954).

El recurso no trata ni en modo alguno puede referirse a las relaciones filiatorias entre el menor abandonado y el marido de la mujer que lo procreó. Es elemental en nuestro derecho que la filiación civil no se establece ni se destruye por una sentencia dictada en una acción penal de abandono de menores y que tal filiación tiene que ser probada de nuevo en el pleito civil y por medios ajenos a la sentencia penal. No obstante estos principios básicos, el Tribunal interpreta la Ley núm. 108 conjuntamente con los artículos del Código Civil relativos a la legitimidad (arts. 113 a 117) y establece hoy la siguiente norma: En una acción penal de abandono de menores bajo la citada Ley núm. 108 (o el art. 263 del Código Penal) no puede declararse convicto a un padre natural de un hijo engendrado en una mujer casada con otro hombre hasta tanto no se hubiere impugnado con éxito en una acción civil la legitimidad del hijo de acuerdo con los citados artículos del Código Civil.

Se aduce en apoyo de esa regla que el procedimiento penal no es el instrumento adecuado para resolver la controversia planteada porque "la acción a seguirse debe permitirle en ley [al menor] cambiar de un estado filiatorio a otro con la debida adjudicación de los derechos de todas las partes afectadas, inclusive cualquier conflicto de interés entre [el] menor y su propia madre. . ." Refiriéndose a los arts. 113 a 116 del Código Civil, se añade que "otro interés social, manifestado a través de una clara y bien definida política legislativa" impide el uso de los procedimientos penales y que corresponde a la rama legislativa "ofrecer la solución deseable."

Estimo que es erróneo el criterio del Tribunal porque (1) se funda en una interdependencia de las acciones civiles y penales que carece totalmente de base jurídica; (2) crea problemas jurídicos y prácticos tan graves como los que alegadamente pretende eliminar; (3) coloca a los hijos adul-

terinos de mujer casada, y como veremos a otros hijos ilegítimos, en una posición de desigualdad; (4) llevado a su conclusión lógica destruiría en gran medida los propósitos legislativos encarnados en la legislación sobre abandono de menores; y (5) está desarraigado de las duras realidades sociales que por causa de la migración en masa vive hoy día una considerable parte de nuestro pueblo.

## I

En una de las primeras sentencias sobre el art. 263 del Código Penal—*Pueblo* v. *Ferrán*, 26 D.P.R. 263, 265 (1918)—este Tribunal, basándose en la jurisprudencia de California, adoptó la regla de que "las disposiciones de la ley civil sobre la materia en nada influyen en la interpretación que deba darse al estatuto criminal".[1]   Esta regla fue expresamente confirmada en *Rosario* v. *Suárez*, 67 D.P.R. 589, 593 (1947), añadiéndose que "En igual forma las disposiciones de la Ley 108 de 1940 o del Código Penal sobre el delito de abandono de menores, en nada deben influir en cuanto a la interpretación que deba darse al Código Civil." Este principio de separación de la ley civil de la penal se aplicó en numerosas sentencias y el Tribunal protegió siempre la facultad del estado de obligar al padre natural a proveerle alimentos a sus hijos menores de edad, independientemente de los resultados en la jurisdicción civil.   Dijo el Juez Presidente señor Del Toro en *Pueblo v. López*, 54 D.P.R. 294, 296 (1939): "Se trata de un solo delito cuya esencia consiste . . . en el abandono voluntario y sin excusa de los hijos, sean éstos de la clase que fueren. . ."   En casos de esta naturaleza añadió, no puede llegarse a "poner un valladar, en la mayor parte de los casos infranqueable, a la debida administración de la justicia que exige que los padres no abandonen a sus hijos aun cuando los procreen faltando

---

[1] Se utilizó de manera restrictiva en este primer caso para negarle alimentos a un hijo ilegítimo, fundándose en que la ley penal, contrario a la civil, sólo era de aplicación a los hijos legítimos.

a los deberes que un matrimonio debidamente constituído les impongas y a virtud de actos constitutivos de delito. Si otra interpretación se adoptara se desnaturalizaría el propósito de la ley y en cierto modo se premiaría a un delincuente por el hecho de serlo." (Pág. 299.) Y más aún: "La obligación del padre surge del hecho sustancial de serlo. Probado en debida forma que lo es y que siéndolo dejó de cumplir su obligación en la manera que la ley penal establece, el delito debe entenderse cometido." (Págs. 300–301.)

De acuerdo con estos postulados, el Tribunal rechazó repetidamente la tesis mediante la cual se pretendía incorporar a la acción penal los requisitos de prueba de la acción civil de filiación, particularmente los enumerados en los arts. 125 y 129 del Código Civil. *Pueblo* v. *Ortiz*, 67 D.P.R. 903 (1947); *Pueblo* v. *Rodríguez*, 67 D.P.R. 735 (1947), *Pueblo* v. *López*, 67 D.P.R. 780 (1947).

Ese criterio judicial se mantuvo firme durante muchos años y hasta el, a mi juicio, desafortunado fallo en *Pueblo* v. *Santiago*, 70 D.P.R. 837 (1950) revocado expresamente en *Agosto* v. *Javierre*, 77 D.P.R. 471, 478 (1954). Se funda ese criterio en el clásico principio de separación entre las acciones civiles y penales consagrado en la ley y jurisprudencia nuestras.[2] El Tribunal, no obstante, crea hoy imaginarios conflictos de intereses entre la madre y el hijo y afirma que como consecuencia de la reclamación el hijo "dejará de pertenecer a una familia con todos los derechos que en ella le corresponden para formar parte de otra distinta con otros derechos o sin ninguno de ellos." No se explican, sin embargo, los fundamentos de tales afirmaciones ni se señalan cuáles provisiones, sustantivas o de procedimiento, o cuáles doctrinas jurídicas producirían ese resultado. Lo correcto es que tales peligros no existen y que en este caso, no importa lo que suceda en la acción penal,

---

[2] Art. 2 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2; *Ramírez* v. *Morales*, 69 D.P.R. 703, 706 (1949); *Colón* v. *Secretario de Hacienda*, 79 D.P.R. 859 (1957).

las relaciones paternofiliales en la esfera civil entre el menor y su presunto padre legítimo continuarán intactas. En realidad, lo que el Tribunal hace en este caso es fundir las acciones penales y civiles sin aducir una sola razón en su apoyo, para luego derivar nefastas consecuencias de esa insostenible fusión que es producto de su propia obra.

La regla seguida por la gran mayoría de las jurisdicciones norteamericanas y de la Comunidad Británica mantiene que "cuando una sentencia dictada en una acción criminal se ofrece en una acción civil para probar los hechos en que se funda, no es admisible como evidencia de tales hechos." 2 Wharton, *Criminal Evidence*, (1955) sec. 640. Esa es también la regla en Puerto Rico, aunque se ha aplicado al expediente completo de la causa criminal. *Ramírez* v. *Morales*, supra; *Colón* v. *Secretario de Hacienda*, supra. Cuando la sentencia está basada en una alegación de culpabilidad se admite como una admisión o confesión de la persona acusada en el proceso criminal, pero nunca como prueba concluyente de los hechos. Los tribunales varían en cuanto al valor que debe darse a esa prueba. Algunos exigen evidencia corroborativa mientras otros le conceden "gran peso". Igualmente, en las acciones criminales la regla general prohibe que se reciba en evidencia un fallo dictado en una acción civil si se pretende por ese medio probar alguno de los hechos en los cuales se basa el fallo.

Para que pudiera afirmarse que en el presente caso se privaría de la paternidad al presunto padre legítimo como resultado de la acción criminal contra el otro hombre, habría a la vez que sostener que, en una acción civil entre el menor y su presunto padre legítimo, la sentencia en el caso criminal constituiría un impedimento absoluto a la acción civil o prueba concluyente de los hechos en que se funda dicha sentencia. Esto, sin embargo, no sería así ni tan siquiera en una acción civil entre el menor y la persona convicta en el proceso criminal y mucho menos lo sería en una acción

civil en la que fuera parte el padre legítimo. En los dos casos, de acuerdo con el estado actual de nuestros ya citados precedentes, la sentencia en el caso criminal no podría admitirse como prueba.(³)

En *Commissioner of Public Welfare* v. *Koheler,* 30 N.E.2d 587, 591 (N.Y. 1940) se planteó una situación muy similar a la presente, excepto que la ley aplicable autorizaba expresamente el procedimiento contra el padre de hecho en casos de separación entre los cónyuges o de impotencia del marido. Expresó el Tribunal de Apelaciones de Nueva York:

"Tal procedimiento puede ser iniciado por la madre o . . . por un funcionario público. Sec. 64, subdivisión 1 de la Inferior Criminal Courts Act. El niño no es una parte necesaria en el procedimiento como tampoco lo es el marido de la madre. La orden que se dicte en ese procedimiento no constituye una

---

(³) *Cf. Chabrán* v. *Méndez,* 74 D.P.R. 768 (1953) donde resolvimos que un hijo es parte indispensable en un pleito sobre impugnación de su legitimidad. En *Gonzales* v. *Pacific Greyhound Lines,* 214 P.2d 809 (Cal. 1950) un menor entabló demanda de daños por la muerte de su padre legítimo. La demandada atacó la legitimidad del hijo ofreciendo en evidencia una sentencia de divorcio en la cual un tribunal, al dictar una orden interlocutoria de custodia y alimentos, había resuelto, fundándose en el testimonio de la madre, que el menor no era hijo de su presunto padre legítimo. El Tribunal Supremo de California dictaminó que la sentencia de divorcio y la orden interlocutoria no eran admisibles en evidencia para propósito alguno porque el menor no había sido parte en el primer litigio y la determinación sobre su status hecha en él no le obligaba.

Discusiones detalladas de estos problemas, con abundantes citas de jurisprudencia y leyes, se encuentran en las siguientes fuentes: 4 Wigmore, *On Evidence,* (3ra ed. 1940) sec. 1346a; Mueller y Whinery, *Second-Hand Judgments: Reciprocal Use of Judgments in Civil and Criminal Matrimonial Cases,* 15 Wash. and Lee L. Rev. 44, 63–72 (1958); Zogg, *Judgments as Evidence Against One Not a Party to Them,* Wis. L. Rev. 307 (1946); 2 Wharton, *ob.cit.,* Secs. 639, 640; Cowen, *The Admissibility of Criminal Convictions in Subsequent Civil Proceedings,* 40 Cal.L.Rev. 225 (1952); *Judgments in Bastardy Proceedings as Conclusive of Issues in Subsequent Bastiardy Proceedings,* 37 A.L.R.2d 836 (1954); *Conviction or Acquittal as Evidence of the Facts on Which it was Based in Civil Action,* 18 A.L.R.2d 1287 (1951); *American Law Institute, Model Code of Evidence,* Regla 521, págs. 280–282 (1942); *Cf. Admissibility of Traffic Conviction as Proof of Facts in Subsequent Action,* 50 Col. L. Rev. 529 (1950).

adjudicación que les oblique o que obligue a aquellas personas que por medio de ellos puedan reclamar que el niño es o no es el hijo legítimo de padres casados entre sí. Una orden que resuelva que el padre del niño es una persona distinta del marido de la madre no es, obviamente, una adjudicación obligatoria de ilegitimidad. No establece el status del niño ni constituiría evidencia competente para establecer la ilegitimidad en cualquier otro procedimiento en el cual otras personas sean partes."

Por esas razones se permitió a los esposos declarar sobre sus relaciones íntimas, cosa que no podían hacer en procedimientos dirigidos a fijar el status del menor. Esta es la regla que prevalece en el estado. *People* v. *Arcieri*, 167 N.Y. S.2d 437 (1959).

Por consiguiente, si declaráramos convicto al acusado a lo sumo sucedería que en este y otros casos similares existirían dos acciones contra dos personas distintas que podrían resultar en la concesión de alimentos al menor. Mediante una, el estado haría uso de la vía penal para obligar al padre natural a satisfacer los alimentos; mediante la otra el menor utilizaría la demanda civil para exigirle alimentos a su presunto padre legítimo. Aunque sin duda esa sería una situación anómala, (⁴) no lo sería menos que otras consagradas anteriormente en el mismo campo por la ley y jurisprudencia nuestras y tendría, como veremos más adelante, inatacables fundamentos de equidad social.

En el pasado este Tribunal descartó en cuanto a la acción penal los elementos formales de prueba de la paternidad

---

(⁴) Los artículos 113 a 117 del Código Civil vigente ofrecen al presunto padre legítimo los medios de impugnar la legitimidad y, por lo tanto, de ponerle fin a esa situación anómala. La acción en tales casos "deberá ejercitarse dentro de los tres meses siguientes a la inscripción del nacimiento en el registro si el marido se hallare en Puerto Rico, y de los seis meses si estuviere fuera de Puerto Rico, a contar desde que tuvo conocimiento del nacimiento". (Art. 117.) En el presente caso hay prueba de que el hijo no fue inscrito pero no de que el marido supiera del nacimiento. No he hallado jurisprudencia nuestra que explique cuándo comenzaría a correr el término de prescripción en esas cir--

natural e ilegítima que exigía la legislación civil (arts. 125 y 129 del Código Civil) y en su lugar colocó todos los medios de prueba que admite nuestra ley de evidencia. Llegó, como sabemos, al extremo de sancionar el principio de que el testimonio de la madre sobre las relaciones sexuales, si creído, es suficiente para declarar probado el hecho de la paternidad. *Pueblo* v. *Mercado*, 69 D.P.R. 335 (1948); *Pueblo* v. *López*, supra; *Pueblo* v. *Bernabe*, 63 D.P.R. 400 (1944); *Pueblo* v. *De Jesús*, 57 D.P.R. 708 (1940); *Pueblo* v. *Dávila*, 53 D.P.R. 234 (1938). Y a nadie, desde luego, se le ocurrió que esa declaración de paternidad tendría efectos de clase alguna sobre los nexos jurídicos entre padres e hijos en la esfera civil. No creo pueda afirmarse que la política pública sobre cómo y en qué procedimiento se puede impugnar la paternidad legítima y quiénes pueden hacerlo sea más vital que la política pública sobre cómo y en qué procedimiento se puede probar la paternidad natural e ilegítima y quiénes pueden hacerlo, a menos desde luego, que se esté dispuesto a la vez a afirmar que la primera, pese a los claros mandatos de ley y de Constitución, conserva en nuestro sistema una posición más privilegiada que las últimas.

Al adoptarse el principio de prueba reseñado en el párrafo anterior se reconoció en Puerto Rico la existencia de una clase de hijos que tenían padres para un solo propósito—el de alimentos—pero que no los tenían para todos los demás propósitos. Esta situación de un hijo con una "fracción" de padre es tan anómala, y si se quiere tan "anti-

cunstancias. Véanse sobre el problema: 5 Castán, Derecho Civil Español, Común y Foral 34 (1958); 2 Martínez Ruiz, El Código Civil 34 (1900); 3 Scævola, Código Civil 309 (1942); Muñoz Morales, Reseña Histórica y Anotaciones al Código Civil de Puerto Rico 346 (1947). Recuérdese, además, que tanto la acción civil como la penal tienen por base la necesidad de alimentos del hijo y la capacidad del padre para satisfacerlos. Es obvio que si el hijo recibe adecuados alimentos de su presunto padre legítimo, no procedería la acción penal contra el padre de hecho.

jurídica", como la de un hijo con un padre y una "fracción" de otro, que sería la que en casos extremos podría resultar al adoptarse una regla contraria a la que hoy acepta el Tribunal.([5])

En verdad, nuestra legislación y todas las legislaciones han estado llenas de esas anomalías causadas por el choque entre las nuevas ideas sobre la responsabilidad del padre natural y las ideas tradicionales sobre la ilicitud e inmoralidad de las relaciones extramatrimoniales y el estigma sobre sus frutos. Para verificar ese aserto, basta recordar la trayectoria de nuestra legislación sobre hijos naturales e ilegítimos desde comienzos de siglo hasta el presente. Probablemente, el caso más extremo fue el de 1945 cuando la Asamblea Legislativa decretó que ciertos hijos podían obtener el reconocimiento de sus padres solamente en cuanto al apellido. (31 L.P.R.A. sec. 502.)

Al adoptar los criterios que ya he explicado, el Tribunal hizo caso omiso de las anomalías y consecuencias "antijurídicas" que sus fallos causaban en el orden civil, empeñándose en eliminar el patrimonio de hambre que el dictamen opuesto impondría a numerosos hijos. Ese debe ser también nuestro empeño en la presente situación.

---

([5]) En *Rodríguez* v. *Comisión Industrial*, 58 D.P.R. 111 (1941) se planteó a este Tribunal la cuestión de si una hija engendrada por un hombre en una mujer casada con otro tenía derecho a la compensación por la muerte de su padre natural en un accidente del trabajo. La niña había sido inscrita como hija legítima del esposo de la madre. Se alegó por los recurrentes que tanto los artículos del Código Civil sobre la legitimidad como lo prescrito en la Ley de Registro Civil impedían conceder la compensación. El Tribunal, por voz del Juez Presidente señor Del Toro, rechazó esos argumentos. Sostuvo que se trataba exclusivamente de una cuestión de dependencia y añadió: "Lo que la comisión resuelve no tiene más alcance que el de los límites del propio caso de la compensación. La inscripción del registro civil seguirá en pie a no ser que sea anulada por una corte con jurisdicción para ello, de acuerdo con la ley." Como podrá observarse es ésta también una situación en la cual la ley reconoce que una persona es "padre" de un niño para un propósito muy limitado, mientras para todos los demás fines considera a otra persona también "padre" del mismo niño.

## II

Un examen de los probables efectos de la regla que hoy se adopta demuestra los complejos problemas que crea y lo gravemente irreal que resulta en su aplicación. Tres ejemplos son suficientes:

*a.* *A* y *B* se casan y a los pocos meses se separan, sin tener hijos. *B*, el marido, continúa viviendo en la misma ciudad que *A*.(⁶) Pasados unos meses de la separación, *A* se amanceba públicamente y por varios años con *C*, hombre a su vez casado con *D*. De esa unión ilícita, pero no por eso menos fecunda, nacen tres hijos, los cuales *C* reconoce y luego abandona. Aplicada la propuesta regla a estos hechos resultaría que hasta tanto se impugnare con éxito la legitimidad, el marido sería responsable criminalmente por el abandono de los hijos de *A* y el estado no podría responsabilizar a *C*, el padre natural, por el abandono. Además, si *C* se hubiese amancebado con una mujer soltera, sus hijos hubiesen podido utilizar la vía penal para exigirle alimentos, pero al hacerlo con una mujer casada se les cierra el camino.

*b.* *A*, mujer casada con *B*, se separa de éste y se une a *C* públicamente, procreando tres hijos. *B* continúa residiendo en el mismo pueblo que *A*. Luego de nacidos los hijos, *A* se divorcia de B, se casa con *C* y ambos reconocen los hijos como suyos. *C* abandona a sus hijos. De acuerdo con la ley vigente desde 1947 (31 L.P.R.A. secs. 481–486) los tres hijos quedan legitimados por el subsiguiente matrimonio de los padres entre sí, a contar de la fecha del matrimonio. Sin embargo, la aplicación literal del art. 113 haría de estos niños

---

(⁶)Nuestra jurisprudencia tiene resuelto que "la imposibilidad física de acceso" (art. 113 del Código Civil) por la cual el marido puede impugnar la legitimidad de un hijo, no se produce cuando marido y mujer viven en la misma ciudad—*Cubano* v. *Del Valle,* 69 D.P.R. 579 (1949)—o en pueblos cercanos—*Burgos* v. *Vázquez,* 48 D.P.R. 416 (1935); *Núñez* v. *Lacot,* 32 D.P.R. 81 (1923). Afortunadamente, el Tribunal deja hoy para consideración posterior el problema de si la regla de prueba que consta en la segunda oración del art. 113 debe seguir interpretándose estrictamente y en términos puramente geográficos.

hijos legítimos de *B*. Otra vez la regla propuesta impediría al estado culpar a *C* por el abandono de sus hijos, hasta tanto la cuestión de legitimidad se dilucidara en un pleito civil. Y si en los dos ejemplos anteriores *B* se ausentara de Puerto Rico o se desconociera su paradero, pasarían meses, o tal vez años, antes de que pudieran completarse los trámites procesales necesarios en dicho pleito.

*c.* Con los mismos hechos del primer ejemplo, supongamos que uno de los hijos de *A* y *C* es una niña, *F*, y que al llegar a los dieciocho años su padre natural comete el delito de incesto con ella. Se trae la acción penal correspondiente y se presenta la misma defensa que en el presente caso—*F* es hija legítima del marido de *A* y esa legitimidad sólo puede impugnarse en una acción civil. *Cf. Pueblo* v. *González*, 26 D.P.R. 424 (1918). Luego de aceptar esa defensa en una causa de abandono de menores, no veo cómo podríamos rechazarla en una de incesto, a menos, desde luego, que estuviéramos dispuestos a aceptar que la política pública en cuanto al matrimonio entre parientes es más importante que la política pública sobre el sostenimiento de los hijos, algo, a mi juicio, imposible de mantener. Y cabe añadir que si validáramos para el incesto la regla que hoy se adopta, tendríamos a la vez que aceptar que la hija y el padre natural podrían, en esas circunstancias, contraer matrimonio.

Estimo, además, que de la determinación que hoy hace el Tribunal fluyen también consecuencias de "antijuridicidad", aunque tal vez con menos dramatismo que las que se apuntan en la opinión de mayoría. Veamos dos ejemplos:

*A* y *B*, solteros, viven en público concubinato por varios años y en ese tiempo *A* da a luz dos hijos. Un buen día la madre denuncia a *C*, de acuerdo con la Ley núm. 108, alegando que él es el verdadero padre de su segundo hijo. Es claro que a la luz de nuestros precedentes, el tribunal de instancia tendría que hacer una investigación de la pater-

nidad para determinar si en verdad *C* es el verdadero padre y, si existe prueba suficiente, tendría que condenar a *C*. Pero es obvio que en esa situación tampoco puede hacerse "una debida adjudicación de los derechos de todas las partes afectadas" porque (1) hay la posibilidad de conflicto entre la madre y el hijo debido a que el segundo tiene una acción de reconocimiento contra el concubino *B* por razón del art. 125 del Código Civil; (2) el concubino no tiene que ser oído, aunque él podría alegar que el hijo es suyo y que interesa reconocerlo; (3) hay las mismas probabilidades reales (aunque no de presunción de ley) de confusión de prole que en el caso del marido.

Para un segundo ejemplo puede complicarse la situación estableciendo el hecho de que *B*, el concubino, había ya reconocido voluntariamente al hijo antes de iniciarse la acción penal. En tal caso surgiría también un conflicto entre la disposición de ley(7) y el hecho natural y cierto de la paternidad. *Cf. García* v. *García*, 18 D.P.R. 963 (1912); *Alcaide* v. *Morales*, 28 D.P.R. 278 (1920).

¿Qué haríamos en cualquiera de estos dos casos? ¿Decirle al hijo que tiene que dilucidar esos problemas en una acción civil de filiación donde los dos supuestos padres estén presentes, o permitir la acción penal ordinaria, pese a la anomalía y los defectos de "antijuridicidad", pero vindicando la política pública de que "la obligación del padre surge del hecho sustancial de serlo"? Me parece no habría otra alternativa que la segunda. Nuestra sentencia de hoy, sin embargo, es por sus fundamentos contraria a ese resultado.

### III

Cierto es que algunos precedentes norteamericanos se pronuncian en favor de la tesis que hoy sustenta la mayoría del Tribunal. Pero es igualmente cierto que esa jurispru-

---

(7) Art. 38 de la Ley núm. 24 de 22 de abril de 1931 (24 L.P.R.A. sec. 1237). *Cf. Maldonado* v. *Bravo*, 73 D.P.R. 206, 209 (1952).

dencia se asienta sobre conceptos jurídicos y de moral social que por acción de ley y de Constitución, y por lo menos en cuanto a sus efectos legales, hace tiempo extirpamos de nuestro medio. Además, es también claro que varias jurisdicciones han procedido legislativamente a eliminar las innegables injusticias que los antedichos fallos judiciales habían creado.

Indice firme de lo primero es *In re Madalina*, 174 Cal. 693, 697; 164 Pac. 348 (1917), principal precedente en que se apoya la mayoría. La razón fundamental de esa sentencia es la de que "los intereses de la política pública, la decencia, la moralidad y la protección de niños inocentes" requerían que no se permitiera al estado impugnar la paternidad, porque esa impugnación sería contraria al "bienestar, comodidad y felicidad de niños inocentes que deben ser protegidos contra el estigma de la ilegitimidad o las calumnias sobre su nacimiento."(⁸) Y en *State* v. *Randall*, 53 So.2d 689, 691 (1951), también citado por la mayoría, el Tribunal Supremo de Luisiana, al resolver que no procedía la acusación criminal contra el padre de hecho, dijo:

"La santidad con que la ley rodea las relaciones maritales y la reputación y buena fama de la esposa y de los hijos nacidos durante el matrimonio es de tal manera inviolable que la madre y los hijos no pueden tacharse a sí mismos con declaraciones de adulterio, ilegitimidad y bastardía, y no puede permitirse tal difamación sobre sus caracteres, no importa cuán ciertos, desafortunadamente, puedan ser los odiosos y tristes hechos."

---

(⁹) En California se enmendó el art. 195 del Código Civil y el art. 270 del Código Penal para dejar sin efecto el caso de *Madalina* y permitir al estado impugnar la legitimidad en casos criminales de abandono de menores. Las reglas aplicables a la litigación civil no se cambiaron. 2 Armstrong, *California Family Law* (1953) Suplemento de 1956, págs. 159, 162-163. Véanse, además, la ley de Nueva York citada en el caso de *Koheler*, supra y la del Distrito de Columbia, *Peters* v. *District of Columbia*, 84 A.2d 115 (D. C. Cir. 1951).

Es evidente, sin embargo, que tanto la sustancia como la retórica de esos pronunciamientos no tienen vigencia alguna desde hace muchos años en nuestro país. Frente al llamado estigma de la ilegitimidad, nuestro pueblo ha levantado, primero con rango de ley y luego de Constitución, el noble y humano principio de la igualdad del nacimiento, por el cual "el fruto inocente de [las uniones ilícitas] debe advenir al mundo libre de descalificaciones y de inferioridades jurídicas." *Informe de la Comisión de Carta de Derechos a la Convención Constituyente* (1951). Y frente a la hermética regla del art. 116 del Código Civil que autoriza sólo al marido y a sus legítimos herederos a impugnar la legitimidad de los hijos nacidos en el matrimonio, este Tribunal, acuciado por las mismas razones legales, constitucionales y de dignificación social, levantó en *Agosto* v. *Javierre* y ahora por unanimidad reafirma, el derecho de esos hijos a buscar a sus verdaderos padres por los caminos de la ley civil.(⁹) Es obvio que nunca hubiésemos podido sentar esa norma si hubiésemos adoptado la jurisprudencia que hoy aprueba la mayoría. Los mismos motivos también nos obligan a rechazar los precedentes norteamericanos, frutos de otras concepciones jurídicas y sociales, y a reconocerle al estado la facultad—que la ley aplicable en modo alguno le niega—de exigirle a esos padres, por medio de los correspondientes procedimientos penales, el cumplimiento de sus obligaciones naturales y de ley.

Descartada la jurisprudencia norteamericana por las razones descritas, sólo queda en apoyo de la tesis de la mayoría el aparente conflicto entre la política pública sobre legitimidad y la política pública sobre abandono de los hijos.

---

(⁹) No hay, desde luego, en las circunstancias de estos casos matrimonio alguno que salvar, porque el mismo se ha convertido en escombros por acción de una o de las dos partes. Esa idea está implícita en la aprobación que hoy damos al procedimiento civil como vehículo para resolver los problemas que estamos discutiendo.

El Tribunal resuelve hoy ese "conflicto" en favor de la legitimidad, negándole de paso a un gran número de niños la protección que en la esfera penal el estado ideó para ellos.

Sostengo enfáticamente que tal conflicto no existe, y que si acaso existiera, es la función clásica e inescapable de los tribunales buscar la interpretación que razonablemente lo elimine, haciéndole al legislador la elemental justicia de no achacarle la aprobación de disposiciones contradictorias. La única manera de lograr ese resultado es la de mantener el procedimiento penal estrictamente dentro de su limitado radio de acción y asequible a todos los hijos, no importa el origen de su nacimiento, mientras se reserva el procedimiento civil para resolver las controversias de status.

Esa interpretación conserva incólume el principio de la igualdad del nacimiento, esencia de nuestras instituciones jurídicas y de nuestro pensamiento colectivo. Por el contrario, la norma que hoy adopta el Tribunal coloca a un gran número de niños, precisamente por las circunstancias de su nacimiento, en una posición de inferioridad jurídica y les niega una protección que el estado ofrece a todos los demás. Ante ese resultado, un legislador de inclinaciones literarias podría exclamar, parafraseando la clásica ironía orwelliana, que "en Puerto Rico todos los hijos son iguales, pero hay algunos hijos más iguales que otros."

## IV

Creo evidente, considerando algunos de los ejemplos citados en esta opinión, que la norma que hoy se adopta por el Tribunal es en gran medida frustránea de los propósitos que animaron al legislador al aprobar la Ley núm. 108 y el art. 263. Esa norma, desde luego, hay que entenderla y cobra autoridad únicamente a la luz de las razones en que se funda. Los tribunales de primera instancia habrán de examinar esas razones para determinar cómo encajan en situaciones de hecho diferentes de la que plantea el presente recurso, aunque relacionadas con ella.

Las razones del Tribunal, como vimos anteriormente, se basan principalmente en la supuesta deficiencia del procedimiento penal para resolver todos los conflictos que la situación presenta, en especial los que surgen entre la madre y el hijo y entre el padre de hecho y el presunto padre legítimo. Es por eso necesario, se afirma, mudar el asunto a la esfera civil, en la cual, luego de ser debidamente citadas todas las personas se podrá hacer una adjudicación judicial válida de todos los derechos e intereses afectados. Me parece obvio que la aplicación lógica de ese razonamiento a otras situaciones producirá inevitablemente la remoción de la jurisdicción penal de todo caso en que el acusado alegue que él no es el padre del menor y pueda señalar hacia la probabilidad de que otro hombre lo sea. Independientemente de que ese otro pueda ser el padre legítimo o el ilegítimo, o de que en este último caso el hijo esté o no oficialmente reconocido, tan pronto se apunte hacia la probabilidad de que otro individuo, y no el acusado, pueda ser el padre del menor es obvio que surgirían los conflictos de intereses en la esfera civil entre la madre y el menor y entre los dos supuestos padres. Los tribunales de primera instancia se verían forzados, entonces, a suspender toda acción en esos casos hasta tanto se resolvieran tales conflictos en el orden civil.

Son indudablemente graves las consecuencias de ese razonamiento para la debida administración de la Ley núm. 108 y del art. 263 del Código Penal. El esfuerzo legislativo para erradicar la irresponsabilidad paterna mediante la creación de un instrumento judicial rápido, sencillo y eficaz que se apoya en la fuerza coactiva del estado queda así destruido en su aplicación a cientos de niños desamparados. [10]

---

[10] La acción penal de abandono de menores sigue siendo el arma jurídica principal de que dispone nuestra comunidad para compeler a los padres a cumplir con sus deberes hacia sus hijos. Las cifras suministradas por nuestra Oficina de Administración de Tribunales demuestran lo siguiente: ·

Para encontrar alivio a sus necesidades más perentorias, exigiéndoles a sus verdaderos padres el cumplimiento de la obligación primaria que emana de la paternidad, ahora tendrán esos niños que acogerse al lento, complejo y costoso procedimiento civil que requieren las acciones filiatorias, [11] desesperar durante meses mientras se resuelven las controversias y pagar en privaciones, enfermedades y delincuencia juvenil el precio de esas tardanzas. La situación se tornará aún más patética para aquellos niños cuyos presuntos padres legítimos, como parte de la enorme corriente migratoria de los últimos años, se encuentran fuera del país. [12]   Para

TRIBUNAL DE DISTRITO

Casos de Abandono de Menores

y Apelaciones al Tribunal Superior

| Año | Pendientes | Presentados | Convicciones | Apelaciones | % de Apelaciones |
|-----|-----------|-------------|--------------|-------------|------------------|
| 1956–57 | 1085 | 3136 | 1803 | 30 | 1.7 |
| 1957–58 | 1013 | 3404 | 1891 | 29 | 1.5 |
| 1958–59 | 1187 | 3249 | 2000 | 25 | 1.2 |

Sin embargo, la acción de alimentos en el Tribunal Superior durante el año 1958–59 produjo los siguientes resultados: Pendientes: 514; Presentados: 745; Resueltos: 733. No hay información disponible sobre otros años. Un estudio efectuado en diciembre, 1958 por la Oficina de Estadísticas de la División de Bienestar Público concluye que "el abandono, especialmente el del padre varón, va en aumento como causa de dependencia de nuestros niños, especialmente en nuestras clases más necesitadas económicamente" y que "la intervención de las cortes en los casos de abandono produce resultados favorables y que si éstas pudieran regularizar la celebración de vistas de los padres que abandonan a sus hijos podrían tenerse mayores logros económicos y sociales". Departamento de Salud, *Informe Sobre el Resultado del Estudio Bienal Sobre Características de los Casos que Reciben Ayuda...* (Mimeógrafo, 1959, pág. 5.)

[11] No podrían estos niños acogerse a la acción clásica y sumaria de alimentos, porque en ella tampoco podría resolverse adecuadamente la controversia.

[12] No existen datos sobre cuántos niños habrán de hallarse en esta situación. Como un índice general del problema, véanse las siguientes cifras, también suministradas por nuestra Oficina de Administración de los Tribunales, sobre los casos de reclamaciones de alimentos bajo la llamada Ley de Reciprocidad:

ellos habrá tardanzas y trámites adicionales y difíciles problemas legales de jurisdicción y emplazamiento.([13])

No puedo, por las razones ya señaladas, compartir el criterio del Tribunal. Reducido a su premisa básica, ese criterio significa concederle primacía a los factores estéticos en la interpretación de la ley y rechazar, concretamente en este caso, la solución correcta por alegadas razones de "antijuridicidad". Aunque es respetable el interés de mantener la simetría de la ley y de las instituciones jurídicas, no puedo en aras de esa finalidad compartir una interpretación que destruye los propósitos legislativos y está reñida con las realidades sociales imperantes. Debe, a mi juicio, confirmarse la sentencia apelada.

TRIBUNAL SUPERIOR
Distribución de los Casos de Reclamación de Alimentos
Bajo la Ley 71 del 20 de junio de 1956
Años Fiscales 1956–57, 1957–58 y 1958–59
Puerto Rico como Estado Iniciador*

| Año | Pendientes a 30 de junio | Presentados | Resueltos En sus Méritos | Resueltos Archivados | Pendientes a fin de año |
|-----|-----|-----|-----|-----|-----|
| 1956–57 | 1287 | 1613 | 1203 | 303 | 1394 |
| 1957–58 | 1394 | 1658 | 1438 | 103 | 1511 |
| 1958–59 | 1511 | 1623 | 1973 | 578 | 583 |

*Significa que la reclamación de alimentos se inicia en Puerto Rico y se obtienen los pagos mediante la colaboración de los tribunales del estado donde se encuentra el padre.

([13]) La cuestión fundamental consiste en resolver si en un pleito civil donde se impugne la legitimidad es indispensable emplazar personalmente al presunto padre legítimo o si estando éste fuera de Puerto Rico puede válidamente hacerse el emplazamiento mediante la publicación de edictos. La cuestión no ha sido resuelta por este Tribunal. Una vieja sentencia nuestra, Orama v. Oyanguren, 19 D.P.R. 828, 831–832 (1913), dice que "la corte del Estado de una persona que litiga por su estado civil tiene jurisdicción sobre demandados no residentes, aunque no hayan sido notificados personalmente ni tengan bienes en el país. . ." Sin embargo, la regla contraria prevalece en varias jurisdicciones norteamericanas. Véase Hartford v. Superior Court, 304 P.2d 1, 4–5 (Cal. 1956); Conflict of Laws, Personal Jurisdiction Over Alleged Father Required in Bastardy Proceedings, 30 So. Cal. I. Rev. 336 (1956); Parent and Child: Paternity Suit is an Action in Personam, 4 U.C.L.A. L. Rev. 647 (1957); Ehrenzweig, Conflict of Laws (1959) págs. 80–119.